EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TONAL SYSTEMS, INC., | ) | |
| | ) | |
| Declaratory Judgment | ) | |
| Plaintiff and Defendant, | ) | |
| | ) | C.A. No. 20-1197 (VAC) (CJB) |
| v. | ) | CONSOLIDATED |
| | ) | |
| IFIT INC., | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Declaratory Judgment | ) | |
| Defendant and Plaintiff. | ) | |

**TONAL SYSTEMS, INC.'S FIRST AMENDED ANSWER,
DEFENSES, AND COUNTERCLAIMS TO
IFIT, INC.'S FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

Defendant Tonal Systems, Inc. ("Tonal") hereby answers Plaintiff iFIT, Inc.'s ("iFIT")[1]'s

First Amended Complaint ("FAC") (C.A. No. 21-652, D.I. 7).[2]  To the extent any allegations in

the FAC are not expressly admitted and a response to them is required, all allegations in the FAC

are denied.  Tonal responds as follows:

**THE PARTIES**

1.      Tonal lacks knowledge or information sufficient to form a belief about the truth of

the allegations in this paragraph and, on that basis, denies them.

2.      Admitted.

---

[1] iFIT, Inc. was previously named ICON Health & Fitness, Inc.  *See* D.I. 25.

[2] Tonal's First Amended Answer applies to the First Amended Complaint in C.A. No. 21-652,
D.I. 7.  The 21-652 case was consolidated with C.A. No. 20-1197 on February 14, 2022.  *See*
D.I. 58.

1

## JURISDICTION AND VENUE

3.      Tonal admits that iFIT purports to bring claims for patent infringement against Tonal under the patent laws of the United States, 35 U.S.C. § 271 et seq., but denies that Tonal has committed any acts of patent infringement.

4.      Tonal admits that this Court has subject matter jurisdiction over actions brought pursuant to 28 U.S.C. §§ 1331 and 1338, but denies that it has committed any acts of patent infringement.

5.      Tonal admits it is subject to personal jurisdiction in this judicial district for the purposes of this action only.

6.      Tonal admits it is subject to personal jurisdiction in this judicial district for the purposes of this action only.

7.      Tonal does not contest that venue is proper in this judicial district for the purposes of this action only.

## INTRODUCTION
### iFIT's History of Alleged Innovation

8.      Tonal lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and, on that basis, denies them.

9.      Tonal lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and, on that basis, denies them.

10.      Tonal lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and, on that basis, denies them.

11.      Tonal lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and, on that basis, denies them.

12.     The allegations of Paragraph 12 purport to characterize the contents of U.S. Patent No. 10,953,268 ("the '268 patent"), which is a written document; said document speaks for itself. Tonal denies the remaining allegations in this paragraph.

13.     The allegations of Paragraph 13 purport to characterize the contents of U.S. Patent No. 10,967,214 ("the '214 patent"), which is a written document; said document speaks for itself. Tonal denies the remaining allegations in this paragraph.

**Tonal's Alleged Infringement of the Asserted Patents**

14.     Tonal admits that it sells a device that is used for strength and resistance training. Tonal denies the remaining allegations in this paragraph.

15.     Denied.

16.     Tonal admits that it sells its product throughout the United States.  Tonal denies the remaining allegations in this paragraph.

17.     Denied.

18.     Denied.

19.     Tonal admits that the image in this paragraph appears to be taken from Tonal's website, http://www.tonal.com.  Tonal denies any remaining allegations in this paragraph.

<u>**COUNT I**</u>
**(Alleged Infringement of U.S. Patent No. 10,953,268)**

20.     Tonal incorporates its responses to the foregoing paragraphs as if fully set forth herein.

21.     Tonal admits that on its face, the '268 patent lists ICON Health & Fitness, Inc. as the assignee, recites a filing date of December 8, 2020, and an issue date of March 23, 2021, and that what appears to be a copy of the '268 patent is attached as Exhibit A to the First Amended Complaint.  Tonal admits that iFIT has not licensed Tonal to practice the '268 patent.  Tonal denies

that the '268 patent is valid and enforceable, and denies any remaining allegations of this paragraph.

   22.  Denied.

   23.  Denied.

   24.  Denied.

   25.  Denied.

   26.  Denied.

   27.  Denied.

   28.  Denied.

   29.  Denied.

   30.  Denied.

   31.  Denied.

   32.  Denied.

## COUNT II
### (Alleged Infringement of U.S. Patent No. 10,967,214)

   33.  Tonal incorporates its responses to the foregoing paragraphs as if fully set forth herein.

   34.  Tonal admits that on its face, the '214 patent lists ICON Health & Fitness, Inc. as the assignee, recites a filing date of December 8, 2020, and an issue date of April 6, 2021, and that what appears to be a copy of the '214 patent is attached as Exhibit B to the First Amended Complaint. Tonal admits that iFIT has not licensed Tonal to practice the '214 patent. Tonal denies that the '214 patent is valid and enforceable, and denies any remaining allegations of this paragraph.

   35.  Denied.

36.    Denied.

37.    Denied.

38.    Denied.

39.    Denied.

40.    Denied.

41.    Denied.

42.    Denied.

43.    Denied.

44.    Denied.

45.    Denied.

**RESPONSE TO PRAYER FOR RELIEF**

Tonal denies that iFIT is entitled to any of the relief requested in the section of the FAC entitled "Prayer for Relief," or to any relief in any form from either the Court or from Tonal.  Tonal respectfully requests that the Court enter judgment in Tonal's favor and against iFIT on all of iFIT's claims, deny each of iFIT's prayers for relief, find this case exceptional pursuant to 35 U.S.C. § 285, and award Tonal its costs, attorneys' fees, and any other further relief deemed appropriate by the Court.

**DEMAND FOR JURY TRIAL**

iFIT's request for a jury trial includes no allegations and, therefore, requires no response.

**DEFENSES**

Tonal asserts the following defenses.  Tonal does not concede that it bears the burden of proof as to any of the defenses asserted.  Discovery is not yet complete and, therefore, Tonal has not yet collected and reviewed all of the information and materials that may be relevant to the

5

matters and issues raised herein.  Accordingly, Tonal reserves the right to amend, modify, or expand these defenses and to take further positions as discovery proceeds in this case.

## FIRST DEFENSE
### (Invalidity of the '268 Patent)

One or more of the claims of the '268 patent are invalid under 35 U.S.C. §§ 102 and/or 103 as anticipated and/or obvious in view of existing prior art.  Further, one or more of the claims the '268 patent fail to meet the requirements of 35 U.S.C. §§101 and/or 112, and are at least indefinite and lack written description and are not enabled for failing to describe and enable the full scope of the claims.  Further, one or more of the claims of the '268 patent are invalid under the doctrine of obviousness-type double patenting.

## SECOND DEFENSE
### (Non-Infringement of the '268 Patent)

Tonal has not infringed, and will not infringe, directly or indirectly, literally or under the doctrine of equivalents, any valid and enforceable claim of the '268 patent.  To the extent the claims of the '268 patent at issue are interpreted so broadly as to read on any accused product, Tonal has not infringed, and will not infringe, directly or indirectly, any such claim under the reverse doctrine of equivalents.

## THIRD DEFENSE
### (Invalidity of the '214 Patent)

One or more of the claims of the '214 patent are invalid under 35 U.S.C. §§ 102 and/or 103 as anticipated and/or obvious in view of existing prior art. Further, one or more of the claims the '214 patent fail to meet the requirements of 35 U.S.C. §§101 and/or 112, and are at least indefinite and lack written description and are not enabled for failing to describe and enable the full scope of the claims.  Further, one or more of the claims of the '214 patent are invalid under the doctrine of obviousness-type double patenting.

## FOURTH DEFENSE
### (Non-Infringement of the '214 Patent)

Tonal has not infringed, and will not infringe, directly or indirectly, literally or under the doctrine of equivalents, any valid and enforceable claim of the '214 patent.  To the extent the claims of the '214 patent at issue are interpreted so broadly as to read on any accused product, Tonal has not infringed, and will not infringe, directly or indirectly, any such claim under the reverse doctrine of equivalents.

## FIFTH DEFENSE
### (Prosecution History Estoppel)

iFIT is estopped, based on statements, representations, and admissions made in the specification of the patent applications, made during prosecution of the patents applications that led to the iFIT Patents, and/or made during prosecution of related applications, from asserting that the claims of the iFIT Patents are infringed by Tonal, or by Tonal's products or services, either directly, indirectly, contributorily, through the doctrine of equivalents, or otherwise.

## SIXTH DEFENSE
### (No Equitable Relief)

On information and belief, iFIT is not entitled to equitable relief with respect to the iFIT Patents under any theory because iFIT has not suffered and will not suffer irreparable harm, is not without adequate remedy at law, the balance of hardships does not favor entry of an injunction, and/or public policy concerns weigh against any equitable relief.

## SEVENTH DEFENSE
### (No Exceptional Case)

iFIT has no basis to allege that this case is an exceptional case justifying an award of attorney fees to iFIT under 35 U.S.C. §§ 284 and 285.

**EIGHTH DEFENSE**
**(Limitation on Costs)**

iFIT is not entitled to costs and its costs are limited under 35 U.S.C. § 288.

**NINTH DEFENSE**
**(Limitation on Damages)**

iFIT's claims for damages are statutorily limited by 35 U.S.C. § 286 and 35 U.S.C. § 287, including by iFIT's failure to comply with the marking statute under 35 U.S.C. § 287.

**TENTH DEFENSE**
**(Reverse Doctrine of Equivalents)**

Tonal's accused methods, systems, products, and/or features operate and/or are configured in ways substantially different in principle from the purported invention(s) described in the iFIT Patents, and iFIT cannot sustain its burden of proving otherwise.

**ELEVENTH DEFENSE**
**(Unenforceability of the '268 Patent)**

The '268 patent is unenforceable for inequitable conduct for the reasons stated in Tonal's Counterclaim V below.

**TWELFTH DEFENSE**
**(Unenforceability of the '214 Patent)**

The '214 patent is unenforceable for inequitable conduct for the reasons stated in Tonal's Counterclaim VI below.

**ADDITIONAL DEFENSES**

Tonal's investigation of its defenses is ongoing, and Tonal expressly reserves the right to allege and assert any additional defenses under Rule 8 of the Federal Rules of Civil Procedure, the patent laws of the United States, and any other defense, at law or in equity, that may now exist or may in the future be available based upon discovery and further investigation in this case.

**JURY DEMAND**

Tonal requests a jury trial on all claims so triable.

**COUNTERCLAIMS**

Defendant and Counterclaimant Tonal Systems, Inc. (Tonal") hereby complains against Plaintiff and Counterdefendant iFIT, Inc. ("iFIT") as follows:

**THE PARTIES**

1.      Tonal is a corporation organized and existing under the laws of Delaware, with a principal place of business at ~~325 Vermont~~617 Bryant Street, San Francisco, California 94103. Tonal is the creator and manufacturer of a groundbreaking strength training machine that uses sophisticated digital technology paired with a revolutionary motor to simulate and improve upon the feel of physical weights in a compact digital environment.

2.      Upon information and belief, iFIT is a corporation organized and existing under the laws of Delaware, with a principal place of business at 1500 South 1000 West, Logan, Utah, 84321.

3.      Upon information and belief, iFIT claims to be the owner by assignment of all right, title and interest in United States Patents Nos. 10,953,268 ("the '268 Patent") and 10,967,214 ("the '214 Patent~~") (together, the "iFIT patents~~").

**JURISDICTION AND VENUE**

4.      This action arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and under the patent laws of the United States, 35 U.S.C. §§ 1 and 271 *et seq*.

5.      This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1338(a), and 2201(a).

6.      iFIT has filed a complaint against Tonal asserting infringement of the '214 and '268 ~~patents~~Patents and therefore an immediate, real, and justiciable controversy exists between Tonal

and iFIT as to whether Tonal is infringing or has infringed ~~the iFIT~~those patents.

7.      iFIT is subject to general personal jurisdiction in this district because it is a Delaware corporation and thus resides in the District of Delaware.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)–(c) and 1400(b).

**FACTUAL BACKGROUND**

**iFit's History of Meritless Patent Assertion**

9.      iFIT, formerly known as ICON Health & Fitness, Inc. ("ICON") (D.I. 25), is a prolific patent assertion entity.  In the last decade, iFIT has been involved in over 50 lawsuits involving patents in the same patent family as, or otherwise similar to, the '268 and '214 Patents Asserted in this case.  *See, e.g.*, *ICON Health & Fitness, Inc. v. Johnson Health Tech North America*, No. 1:10-cv-00209 (D. Utah); *ICON Health & Fitness, Inc. v. Octane Fitness LLC*, No. 8:08-cv-00437 (C.D. Cal); *Icon Health & Fitness, Inc. v. Octane Fitness, LLC*, No. CIV. 09-319 ADM/SER (D. Minn.); *ICON Health & Fitness, Inc. v. True Fitness Technology, Inc.*, No. 4:18-cv-00439 (E.D. Mo.); *ICON Health & Fitness, Inc. v. Nautilus Inc.*, No. 3:19-cv-05217 (W.D. Wash.); *ICON Health & Fitness, Inc. v. Viatek Consumer Products Group, Inc.*, No. 1:19- cv-00119 (E.D. Tenn.); *ICON Health & Fitness, Inc.. v. Flywheel Sports, Inc.*, No. 2:19-cv-00022 (E.D. Tex.); *ICON Health & Fitness, Inc. v. Polar Electric Oy*, No. 1:11-cv-00167 (D. Utah); *ICON Health & Fitness, Inc. v. Strava*, No. 1:11-cv-00175 (D. Utah); *ICON Health & Fitness, Inc. v. Peloton Interactive, Inc.*, No. 1:16-cv-08303 (S.D.N.Y.); *ICON Health & Fitness, Inc. v. FitnessKeeper*, No. 1:11-cv-00173 (D. Utah); *ICON Health & Fitness, Inc. v. MapMyFitness*, No. 1:11-cv-00174 (D. Utah); *ICON Health & Fitness, Inc. v. Garmin Ltd.*, No. 1:11-cv-00166 (D. Utah); *ICON Health & Fitness, Inc. v. Wahoo Fitness LLC*, No. 8:13-cv-01065 (C.D. Cal.); *ICON*

*Health & Fitness, Inc. v. PaceMaster, LLC*, No. 6:11-cv-00487 (E.D. Tex.); *ICON Health & Fitness, Inc. v. Saris Cycling Group, Inc.*, No. 3:13-cv-0005 (W.D. Wis.).

10.     Many of those actions were settled at early stages.  *E.g.*, *True Fitness*, Case No. 4:18-cv-00439-SRC (E.D. Mo.), D.I. 78; *Viatek*, Case No. 1:19-cv-00119-TAV-CHS (E.D. Tenn.), D.I. 9.  A number of them resulted in judgment against iFIT on the pleadings or summary judgment in favor of the accused infringer.  *E.g.*, *Garmin*, No. 1:11-CV-166-RJS, 2015 WL 5714248 (D. Utah Sept. 29, 2015), *aff'd sub nom. Icon Health & Fitness, Inc. v. Polar Electro Oy*, 656 F. App'x 1008 (Fed. Cir. 2016) (granting judgment on the pleadings); *Octane*, No. CIV. 09-319 ADM/SER, 2011 WL 2457914 (D. Minn. June 17, 2011), *aff'd*, 496 F. App'x 57 (Fed. Cir. 2012), *rev'd and remanded on other grounds*, 572 U.S. 545 (2014) (granting summary judgment).  And many of iFIT's patents have been invalidated—either in district court or before the Patent Trial and Appeal Board ("PTAB")—including a patent in the same patent family as the '268 Patent asserted in this case.  *E.g.*, *Garmin*, 2015 WL 5714248, at *5; *ICON Health & Fitness, Inc. v. Polar Electro Oy*, 243 F. Supp. 3d 1229, 1231 (D. Utah 2017), *aff'd*, 717 F. App'x 1005 (Fed. Cir. 2018); *Interactive Fitness Holdings, LLC v. ICON Health & Fitness, Inc.*, No. 1:11-CV-00075, 2013 WL 687126, at *8 (D. Utah Feb. 25, 2013); IPR2017-01408; IPR2013-00463; IPR2014-00184.

11.     On information and belief, iFIT brings these weak patent suits to discourage and intimidate true innovators because iFIT cannot keep up with—and thus cannot compete with—those innovators in the marketplace.  iFIT sells products and services—namely, exercise equipment and related services.  Having failed to keep pace with the market, iFIT has resorted to asserting meritless claims against any innovative new company it sees as a threat, including Tonal,

to drive up the cost of doing business and stifle competition towards its inferior products.  This litigation is just one of many such meritless actions.

12.    iFIT's unscrupulous enforcement practices have been well-documented.  For example, these practices led to the seminal U.S. Supreme Court case regarding fee-shifting in the patent litigation context:  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014).  In *Octane Fitness*, the district court initially declined to award the defendant (Octane) attorney's fees under 35 U.S.C. § 285, but reversed course after the Supreme Court held that the then-existing standard for fee-shifting was too stringent.  *Octane Fitness*, 572 U.S. at 558.

13.    On remand, the district court found that "[iFIT's] arguments with regard to two critical elements of [the only independent claim of the asserted patent] were particularly weak because they were wholly at odds with the patent text, prosecution history, and inventor testimony, and would have resulted in impermissibly broad claims."  *Icon Health & Fitness, Inc. v. Octane Fitness*, LLC, 112 F. Supp. 3d 888, 892–93 (D. Minn. 2015).  Indeed, the Court noted that in comparison to the "many patent cases over which [the] Court ha[d] presided during the past 22 years as a federal judge, [iFIT's] litigation position [stood] out as a particularly and unusually weak case on the merits.  The arguments advanced by [iFIT] bore no relation to what the [asserted patent] disclosed and covered.  The claim language, specification, prosecution history, inventor testimony, and [iFIT's] own expert testimony posed major obstacles to [iFIT's] success on the merits.  [iFIT] must have known that the odds of winning this lawsuit were very slim."  *Id.* at 895.

14.    The district court also found that iFIT had litigated the case in an exceptionally unreasonable manner.  Octane argued that the action "was contrived by industry giant [iFIT] to punish Octane for its success in the market and to bully Octane into paying royalties to which iFIT

was not entitled." *Id.* at 896.  The court agreed, including based on the following conduct by iFIT analogous to its actions in this case against Tonal.

**No Articulated Pre-Filing Infringement Analysis**

15.    In opposing Octane's request for fees, iFIT provided a declaration from its general counsel asserting that iFIT's outside counsel and an unnamed expert performed an extensive pre-suit analysis of Octane's accused product, expending over 270 hours and over $80,000 in fees and costs.  *Id.* at 896-97.  Yet, iFIT did not produce or log on a privilege log any written communications relating to this analysis.  *Id.* at 897.

16.    The district court found the general counsel's declaration "troubling" for several reasons:

> First, the absence of written documents relating to such a lengthy and expensive pre-suit investigation suggests that the results of the investigation showed exceptionally weak bases for alleging infringement. Second, the extensive amount of time and money spent on the investigation is perplexing given that the lawsuit involves only one independent claim (claim 1). These contentions suggest [iFIT] was scouring its patent portfolio in search of a basis for bringing a lawsuit against Octane. Third, [iFIT's general counsel] does not provide the name or qualifications of the expert retained by [iFIT] to assist in the pre-suit investigation, and it is unclear from the declaration whether the expert who was retained for the pre-suit investigation is the same person as the expert who was retained for the litigation.

*Id.*

17.    In addition, iFIT's general counsel never explained *why* he or iFIT's attorneys believed the pre-suit analysis provided a reasonable basis for iFIT's claims.  *Id.*  Accordingly, the district court found that "[t]he absence of a pre-filing analysis, when combined with [iFIT's] exceptionally weak litigation position, leads to the inference that the pre-filing investigation resulted in a conclusion that probable success on the merits was remote."  *Id.*

**Emails Reflect Improper Motivation**

18.     Shortly after iFIT filed the action against Octane, a sales executive at an iFIT subsidiary sent an internal email stating:  "We are suing Octane.  Not only are we coming out with a great product to go after them, but throwing a lawsuit on top of that."  *Id.* at 898.  He followed that up with:  "[iFIT] does not mess around with this.  They are going to end up paying royalty plus compensation.  Funny thing is—this patent is over 10 years old!"  *Id.*  And he later sent a third email stating:  "Yes. Old patent we had for a long time that was sitting on the shelf.  They are just looking for royalties."  When the executive was deposed, he first (falsely) stated that he learned of the age of the patent and goal of the lawsuit from an article (which did not include that information), and later stated that he could not remember where he learned the information.  *Id.*

19.     The district court determined that "[the executive's] knowledge that the [asserted patent] was an old patent that was "sitting on the shelf" and that [iFIT] was seeking royalties are not the types of details generally known by company sales employees.  [His] knowledge of [] these items suggests they were shared with him by a member of [iFIT's] legal department or upper management."  *Id.*

20.     Although iFIT's general counsel stated in his declaration that the executive was not involved in the decision to sue Octane, he was notably silent on his communications with that executive:  iFIT's general counsel did not say that he had *not* shared his views of the lawsuit with the executive.  *Id.*  The court thus concluded that it was more likely than not that the executive's email comments reflected the views of those involved in the decision to sue Octane.  *Id.*

21.     In sum, the district court concluded that a fee award was appropriate because the preponderance of the evidence showed that "[iFIT] spent substantial time and expense searching its patent portfolio for a lawsuit to 'throw' at Octane."  The court likewise found that iFIT

"employed litigation tactics designed to accelerate Octane's litigation costs in an effort to force Octane to settle rather than defend the suit.  [iFIT's] motive and behavior in litigating this lawsuit were ' 'uncommon,' 'rare,' [and] 'not ordinary.'"  *Id.* at 899 (citation omitted).  The district court subsequently awarded Octane nearly $1.4 million in attorney's fees.  *Icon Health & Fitness, Inc. v. Octane Fitness, LLC*, No. CIV. 09-319 ADM/SER, 2015 WL 5638033, at *3 (D. Minn. Sept. 24, 2015).  Both the exceptional case finding and fee award were affirmed by the Federal Circuit. *ICON Health & Fitness, Inc. v. Octane Fitness, LLC*, 706 F. App'x 666, 669 (Fed. Cir. 2017).

22.     In June 2021, ICON changed its name to iFIT.  It did not, however, change its litigation tactics.  It continues to bring claims as meritless as those asserted against Octane.  As explained further below, iFIT's prosecution of the '268 and '214 Patent families, and its subsequent claims against Tonal, are only the latest examples of iFIT's misconduct.

### The '268 and '214 Patent Families

23.     The '268 and '214 Patents each issued from a series of continuation applications (which themselves led to issued patents).  Although the '268 and '214 Patents are in different patent families, both families relate to cable-based exercise machines wherein the machine provides resistance to a user pulling on a cable.  The '268 and '214 Patents provide the following illustrative examples:



'268 Patent, Fig. 1 (left); '214 Patent, Fig. 1 (right).

24.     The specifications of the '268 and '214 patents explain that one of the main features of the claimed invention is "the use of a flywheel," which, when "combined with a braking mechanism such as a magnetic brake, enables considerable flexibility in setting the desired resistance during exercise," thus "provid[ing] a different form of resistance than in conventional strength training exercises, one that can be measured, tracked, and incorporated into a planned exercise routine." '268 patent at 7:56-63; *see also* '214 patent at 12:20-47 (explaining that the advantage of the claimed invention is its "intuitive energy tracking device," *i.e.*, its "unique flywheel arrangement" coupled with a "magnetic resistance mechanism").

25.     Before the '268 and '214 Patents issued, every claim in the two patent families required the disclosed magnetic mechanism—*i.e.*, a flywheel coupled with a magnetic brake—for providing resistance to a user.  For example, U.S. Patent No. 9,616,276 (the "'276 Patent") (Ex. 1)—an earlier issued patent in the '268 Patent family—claimed:

1. A strength training apparatus, comprising:

16

a base member;

a tower structure coupled to the base member;

at least one arm coupled to the tower structure;

a pulley being coupled to the at least one arm;

a cable extending through the pulley;

a handle coupled to a first end of the cable;

a flywheel connected to the tower structure;

*a magnetic braking mechanism that resists movement of the flywheel*; and

a console in communication with the *magnetic braking mechanism*;

wherein displacement of the handle results in rotation of the flywheel.

'276 Patent, claim 1 (emphases added).

26.     Similarly, U.S. Patent No. 9,403,047 (the "'047 Patent") (Ex. 2)—an earlier issued patent in the '214 Patent family—claimed:

1. A cable exercise machine, comprising:

a first pull cable and a second pull cable incorporated into a frame;

each of the first pull cable and the second pull cable being linked to at least one resistance mechanism; and

the at least one resistance mechanism comprises a flywheel and a *magnetic unit arranged to resist movement of the flywheel*;

wherein the flywheel is attached to a central shaft about which the flywheel is arranged to rotate and the central shaft supports multiple cable spools.

'047 Patent, claim 1 (emphasis added).

27.     The '276 Patent specification (shared by the '214 Patent) explains that the claimed invention includes "a flywheel and a cable and pulley system associated with the at least one arm,

17

wherein displacement of at least one cable of the cable and pulley system effects rotation of the flywheel." '276 Patent at 2:20-24.  The "magnetic brake (sometimes referred to as an eddy current brake) may be used to provide an[] adjustable level of resistance applied to the flywheel."  *Id.* at 4:67-5:3.  The '047 Patent specification (shared by the '214 Patent) includes similar statements. *E.g.*, '047 Patent at 2:10-13 ("In one aspect of the invention, the at least one resistance mechanism comprises a flywheel and a magnetic unit arranged to resist movement of the flywheel.").

**The Nautilus *Inter Partes* Review Proceedings**

28.    Both the '276 and '047 Patents were challenged by Nautilus, Inc. ("Nautilus") in three *inter partes* review ("IPR") proceedings before the PTAB.  IPR2017-01407 and IPR2017-01408 ('276 Patent)[3]; IPR2017-01363 ('047 Patent).  In late November and early December 2018, the PTAB issued final written decisions invalidating all of the claims of the '276 Patent and some of the claims of the '047 Patent.  Ex. 3 (IPR2017-01408, Paper 51) ("'276 IPR, Final Written Decision"); Ex. 4 (IPR2017-01363, Paper 33) ("'047 IPR, Final Written Decision").  The magnetic resistance limitations were central to the issues before the Board.

29.    In the '276 Patent IPR proceedings, iFIT did not argue for the patentability of the issued claims.  Instead, iFIT proposed substitute claims with additional limitations.  Ex. 5 (IPR2017-01408, Paper 17) at 1.  These limitations included a "magnetic braking mechanism including an arm . . . configured to pivot, relative to the flywheel" and a "dial configured to allow the user to select the level of resistance applied to rotation of the flywheel by the magnetic braking mechanism[.]"  *Id.* at 7-9.

30.    The PTAB held a combined hearing for all three proceedings regarding the '276

---

[3] The two proceedings regarding the '276 Patent are substantially similar.  For ease of reference, this pleading cites to IPR2017-01408.

and '047 Patents.  At the hearing, iFIT's outside counsel, John T. Gadd—who helped prosecute both patent families on behalf of iFIT—repeatedly emphasized to the PTAB that the magnetic resistance mechanism was an integral part of the alleged novelty of the inventions described in the '276 Patent.

31.     Specifically, related to the new "pivot" arm limitation, Mr. Gadd explained: "[T]his is what our inventors invented.  They came up with a pulley cable machine that uses a flywheel *and a magnetic braking mechanism, but not just any magnetic braking mechanism, a pivoting arm magnetic braking mechanism*."  Ex. 6 (IPR2017-01408, Paper 50) ("IPR Hearing Tr.") at 72:12-15 (emphasis added).  Mr. Gadd went on to argue that the pivot arm limitation distinguished the claimed invention from the prior art because the only references that taught the use of both a pivot arm and magnetic resistance mechanism in connection with a flywheel were directed to exercise bikes, and a skilled artisan would not be motivated to combine those references with references directed to cable exercise machines.  *See id.* at 72:16-75:10.

32.     Similarly, regarding the new "dial" limitation, Mr. Gadd stated:  "[W]e're talking about a console on an exercise machine that includes this dial and the dial is used to input resistance for a flywheel of the exercise machine *to control a magnetic brake on that exercise machine*."  *Id.* at 71:7-10 (emphasis added).  He conceded that the inventors did not invent the dial—but that "this particular dial and *this particular configuration* coupled with the display [was] an inventive aspect of [their] invention[.]"  *Id.* at 71:10-14 (emphasis added).  He argued that the prior art thus failed to disclose the new dial limitation because, in the prior art, the dial "doesn't control an exercise machine, [it] doesn't control the resistance of a flywheel.  It doesn't control *a magnetic brake*."  *Id.* at 71:15-21 (emphasis added).

33.     Although the PTAB rejected iFIT's arguments and found the proposed substitute

claims invalid over the prior art, it acknowledged that the magnetic resistance mechanism was core to the purported invention.  As a preliminary matter, the issued claims expressly required "a magnetic braking mechanism," and the PTAB considered whether the prior art disclosed that limitation—and determined that it did.  *See* '276 IPR, Final Written Decision at 18-19, 29, 38.

34.     In addition, the PTAB determined that the proposed claim amendments were responsive to the grounds asserted in the IPRs (and thus properly before the Board) in part because of the magnetic resistance limitations.  The PTAB found that "the further detail in proposed claim 21 for the magnetic braking mechanism is responsive to the grounds asserted in the Petition based on a magnetic braking mechanism."  *Id.* at 59.  The PTAB similarly found that the additional limitations relating to "variable resistance and power output" were responsive because they were "closely tied to the use of the magnetic braking mechanism and the function of such in the recited exercise machine, particularly, where as [in that case], the exercise machine relate[d] to strength training in a machine with both aerobic and anaerobic capacity."  *Id.*  In other words, the PTAB determined that the magnetic resistance limitations were so fundamental to the purported invention that additional limitations related to the use of a magnetic resistance mechanism were responsive to Nautilus's arguments for invalidity.

35.     In the '047 Patent IPR proceeding, iFIT's only argument in support of patentability was that one of the references Nautilus relied on did not qualify as a prior art printed publication.  '047 IPR, Final Written Decision at 4.  iFIT did not otherwise dispute the merits of Nautilus's invalidity grounds.

36.     Although the PTAB ultimately excluded the disputed reference as prior art, it found a number of claims invalid under other grounds.  *Id.* at 28.  And most relevant here, the PTAB repeatedly acknowledged that the magnetic resistance mechanism was a key part of the claimed

invention.  The PTAB stated in both its initial institution decision and final written decision that "[t]he '047 patent describes a cable exercise machine that includes a sensor tracking the position of a flywheel incorporated into a *__magnetic resistance mechanism__*."  Ex. 7 (IPR2017-01363, Paper 7) ("'047 IPR, Institution Decision") at 2 (emphasis added); '047 IPR, Final Written Decision at 5.  In both opinions, the PTAB used claim 1 as a representative claim, which requires a "resistance mechanism [that] comprises a flywheel and *__a magnetic unit arranged to resist movement of the flywheel__*."  '047 IPR, Institution Decision 4-5 (emphasis added); '047 IPR, Final Written Decision at 7-8 (emphasis added).  And the PTAB found a number of claims obvious over the prior art in part because the prior art taught this magnetic resistance limitation by disclosing flywheel assemblies that "include 'a *__magnetic (eddy current)__* three wheeled interconnected system *__used as the ergometric input-responsive resistance means__* on the rotating shaft.'"  '047 IPR, Final Written Decision at 23 (emphasis added); *see also* '047 IPR, Institution Decision at 17-18 (finding Nautilus met its initial burden on this limitation for the same reasons).

37.     Throughout the '047 IPR proceeding, iFIT never disputed that the magnetic resistance mechanism was a key part of the claimed invention.  Indeed, iFIT confirmed at the combined hearing that the sole contested issue in the '047 Patent proceeding was whether the disputed reference qualified as prior art.  IPR Hearing Tr. at 23:3-9.

**The Accused Products**

38.     Tonal's product does not contain the magnetic mechanism described in the specification of the '268 and '214 Patent families.  This is by design—Tonal's founder, Aly Orady, invented Tonal's innovative digital motor *because* of the shortcomings of existing resistance mechanisms on the market.  *See, e.g.*, https://www.forbes.com/sites/brucerogers/2021/07/12/aly-oradys-fast-growing-tonal-reinvents-fitness-equipment/?sh=50487d1f7d01.   Weight stacks, for

21

example, took up too much room and were ill-equipped for compact home gyms.  And flywheels with magnetic brakes—which had been used in stationary bikes and rowing machines for years—required acceleration to function, thus limiting the types of strength training exercises a user could perform.

39.     iFIT's Fusion CST line of devices, which iFIT identifies in the FAC as embodying products, *see* FAC ¶¶ 10-11, use flywheels with magnetic brakes.  As with any device that uses a flywheel, a user will not feel the resistance generated by the Fusion CST devices unless they are in the acceleration phase of a pull.  This means that: (1) fast, quick movements are required for an effective workout, thus making the device more suitable for cardio-based training than strength-building; and (2) the user will only feel resistance, and thus build muscle, during the "concentric phase" of the pull—when the user is pulling the cable towards their body—as opposed to the "eccentric" phase of the pull, when the cable is retracting back into the machine.  In addition, although they are typically more compact than physical weights, powerful flywheels are still relatively large, bulky, and heavy—meaning the Fusion CST is as well.

40.     Tonal's proprietary digital weight system solves these problems by eliminating the flywheel system and replacing it with a compact, sophisticated motor that simulates the feel of traditional weights.  Indeed, Tonal has a number of patents on its groundbreaking, award-winning technology, which has taken the fitness world by storm since its inception in 2018.

**iFIT's Threats Against Tonal**

41.     Instead of focusing on improving its own product, iFIT threatened Tonal with unmeritorious litigation designed to drive up Tonal's costs.  On August 21, 2020, iFIT—through its outside counsel, the law firm Maschoff Brennan—sent Tonal a letter asserting infringement of U.S. Patent Nos. 10,709,925 (the "'925 Patent") and 10,758,767 (the "'767 Patent").  The '925

Patent is a child patent of the (invalidated) '276 Patent and a parent patent of the '268 Patent asserted in this case. The '767 Patent is a child patent of the (partially invalidated) '047 Patent, and a parent patent of the '214 Patent asserted in this case.

42.     Like the other patents in these families, the '925 and '767 Patents are directed to cable-based exercise machines. All of the claims of the '925 and '767 Patents require a magnetic mechanism for providing resistance to a user. (*See, e.g.*, D.I. 1-1, Ex. A ('925 Patent), claim 1 (requiring "a magnetic mechanism . . . configured to provide multiple levels of resistance to a user"); *id.*, Ex. B ('767 Patent), claim 1 (requiring "an electromagnetic unit configured to apply one or more levels of resistance to a user")).

**Tonal's Declaratory Judgment Action**

43.     On September 8, 2020, Tonal filed a Complaint for Declaratory Judgment against iFIT seeking declaratory judgment of non-infringement of the '925 and '767 Patents. (D.I. 1 (the original complaint in the lead case of this consolidated action)). In its complaint, Tonal explained that it does not infringe either patent because, among other reasons, Tonal's strength training device does not include the claimed magnetic mechanism for providing resistance to a user. (*Id.* ¶¶ 18, 24).

44.     On September 29, 2020, iFIT, through its outside counsel, sent Tonal a letter stating that iFIT's infringement position "hinges on the parties' differing interpretation of the 'tower' and 'magnetic mechanism' limitations." Thus, iFIT and its outside counsel knew by at least the date of the letter that Tonal would argue that it did not infringe the '925 and '767 Patents, because it did not have the claimed magnetic resistance mechanism.

**iFIT's Prosecution of the '268 and '214 Patents**

45.     On December 8, 2020, iFIT filed the applications that would later issue as the '268

and '214 Patents (together the "December 2020 Applications").  The applications were filed by John T. Gadd—the same individual who represented iFIT in the Nautilus IPR proceedings wherein the PTAB invalidated claims of the related '276 and '047 Patents.  Mr. Gadd was an attorney with Maschoff Brennan, the same law firm that sent iFIT's August and September 2020 letters to Tonal.

46.     In the December 2020 Applications, iFIT—for the first time, after having filed *five* related applications in the '268 Patent family and *six* related applications in the '214 Patent family—sought to patent claims that dropped the limitations requiring a magnetic resistance mechanism.  For example, claim 1 of the application that led to the '268 Patent read:

> 1. A strength training apparatus comprising:
>
> a first arm and a second arm each being configured to be selectively pivoted independent of each other at multiple angles relative to each other;
>
> a first pulley coupled to an end of the first arm;
>
> a first cable extending through the first arm and the first pulley;
>
> a second pulley coupled to an end of the second arm;
>
> a second cable extending through the second arm and the second pulley; and
>
> an electronic control panel configured to allow for multiple levels of resistance to a user pulling on the first cable and/or the second cable, the electronic control panel including:
>
>> a processor and a memory configured to control a current level of resistance,
>>
>> an electronic input device configured to allow the user to set the current level of resistance, and
>>
>> an electronic output device configured to display the current level of resistance.

47.     Similarly, claim 1 of the application that led to the '214 Patent read:

> A cable exercise machine comprising:

a first vertical guide;

a first pull cable routed through a first pulley, the first pulley movable along a length of the first vertical guide;

a second vertical guide;

a second pull cable routed through a second pulley, the second pulley movable along a length of the second vertical guide; and

an electronic control panel configured to:

> electronically allow for one or more levels of resistance to a user pulling on the first pull cable and/or the second pull cable,

> electronically allow for adjustment of the level of resistance to the user pulling on the first pull cable and/or the second pull cable, and

> electronically present the adjusted level of resistance to the user.

48.    iFIT, through its outside counsel Mr. Gadd, then submitted over 1,100 references in each of the December 2020 Applications.  Ex. 8 ('268 Patent); Ex. 9 ('268 IDS January 8, 2021); Ex. 10 ('268 IDS January 11, 2021); Ex. 11 ('214 Patent); Ex. 12 ('214 IDS January 8, 2021); Ex. 13 ('214 IDS January 11, 2021).  These references were submitted in addition to the over 10,000 references collectively submitted in the preceding applications of the '268 Patent family, and over 9,000 references collectively submitted in the preceding applications of the '214 Patent family. Pursuant to the Patent Office's procedures, references disclosed in a parent application are considered to have been disclosed in the child application—which iFIT's seasoned outside counsel were no doubt aware of.  MPEP § 609.02.

49.    The sheer volume of iFIT's disclosures suggests bad faith.  But that is not all: iFIT's disclosures are so obviously irrelevant to the December 2020 Applications that the only plausible explanation for iFIT having made those disclosures is to distract the examiner from the references that were material to the patentability of the applied-for claims.

50.    To illustrate, iFIT disclosed references directed to:

a.    A stand for baseball hitting practice (U.S. Patent Nos. 4,938,478, 4,830,371, 4,681,318)

b.    A portable spa (U.S. Patent No. 6,003,166);

c.    A hydrotherapy pool (U.S. Patent Application No. 2013/0014321);

d.    An improved method and device for the use of insulation layers in manufacturing of semiconductors (U.S. Patent No. 5,393,690);

e.    A novel alloy solder for temperature-hierarchical bonding of semiconductor devices (U.S. Patent No. 6,563,225);

f.    A system for the training and improving of Taekwondo (U.S. Application No. 2016/0303453);

g.    A system for controlling vehicle automatic transmissions intended to prevent clutch degradation (U.S. Patent No. 6,547,698);

h.    The "ornamental design for a needle container" (U.S. Patent No. D332,347);

i.    The "ornamental design for a flashlight" (U.S. Patent No. D452,338);

j.    The design for "a bottle" (U.S. Patent No. D726,476).

51.    iFIT's strategy appears to have been successful.  Just weeks after iFIT submitted its massive and largely irrelevant disclosures, the examiner issued a notice of allowance in both December 2020 Applications.  Ex. 14 ('268 Patent File History, Notice of Allowance and Fee(s) Due (Jan. 29, 2021); Ex. 15 ('214 Patent File History, Notice of Allowance and Fee(s) Due (Feb. 9, 2021)).  The examiner did not issue any rejections of the applied-for claims over the prior art before allowing the claims.  As a result, iFIT obtained claims in both the '268 and '214 Patents

26

that do not include the magnetic resistance limitations—the same limitations that iFIT knew were a basis for Tonal's non-infringement of the related '925 and '767 Patents.

52.     The '268 Patent issued on March 23, 2021, and the '214 Patent issued on April 6, 2021.  A month later, iFIT filed this action against Tonal asserting infringement of the '268 and '214 Patents.  (C.A. No. 21-652, D.I. 1 (filed May 6, 2021).  iFIT's litigation counsel in this action was, at the time, with the law firm Maschoff Brennan—the same law firm that prosecuted the '268 and '214 Patent families and that represented iFIT in the Nautilus IPR proceedings.

The Verstegen, Keiser I, Keiser II References

53.     iFIT had good reason to overwhelm the examiner reviewing the December 2020 Applications.  Buried in the thousands of references disclosed during the prosecution of those applications—including by virtue of having been disclosed in a parent application—were three clearly material references:  U.S. Patent App. Pub. No. 2009/0269728 ("Verstegen") (Ex. 16), U.S. Patent No. 7,955,235 (Ex. 17) ("Keiser I") (that issued from App. Pub. No. 2010/0137114), and U.S. Patent No. 8,052,584 (Ex. 18) ("Keiser II") (that issued from App. Pub. No. 2005/0239615).[4] Notably, iFIT disclosed the Buried References in related applications years *before* it learned of Tonal's non-infringement position based on the magnetic resistance limitations and sought claims without those limitations.  The Buried References do not expressly teach the use of a magnetic resistance mechanism.

54.     Verstegen was filed on April 29, 2008 and published on October 29, 2009. Verstegen is therefore prior art to both the '268 and '214 Patents under 35 U.S.C. § 102(a), as well as prior art to the '268 Patent under § 102(b).

---

[4]     Verstegen, Keiser I (or its published application), and Keiser II (or its published application) are referred to herein together as the "Buried References."

55.     Keiser I claims priority to a provisional application filed on November 13, 2001, was filed on January 29, 2010, and issued on June 7, 2011.  Keiser I is therefore prior art to both the '268 and '214 Patents under 35 U.S.C. § 102 (a) and (b).

56.     Keiser II claims priority to a provisional application filed on April 22, 2004, was filed on December 29, 2004, and issued on November 8, 2011.  Keiser II is therefore prior art to both the '268 and '214 Patent under 35 U.S.C. § 102(a).

57.     Verstegen describes a system for exercise machines that employs a software program that generates a customized workout routine based on the user's physical condition and fitness goals. Verstegen, Abstract, ¶¶ 8, 24, 28.  Verstegen explains that many amateur athletes desire the high-caliber training plans designed by experienced trainers for professional athletes, but generally cannot afford to work with personal trainers on a regular basis.  *Id.*, ¶¶ 4-6.  Thus, demand exists for "a system that automates a substantial portion of the athletic training process." *Id.*, ¶ 7.

58.     Keiser I describes a cable strength training apparatus that utilizes pneumatic air resistance to provide "constant resistance throughout the entire exercise stroke."  Keiser I, Abstract, 2:27-29, 4:24-29.  A user can adjust the amount of resistance applied to the cables by pushing buttons that actuate valves that increase or decrease the air pressure within the pneumatic cylinder.  *Id.*, 8:29-47. In addition, the strength training apparatus "offers a range of adjustability and resistances so that a single piece of exercise equipment can be used to perform a multitude of different exercises." *Id.*, 2:24-26.

59.     Keiser II describes a strength training apparatus that: (1) permits a user to electronically control and view pneumatic resistance, Keiser II, 8:01-44, 10:35-11:04, 12:26-37; and (2) calculates and displays the power expended by the user during the exercise, *id.* at 14:24-

33.  These features "enabl[e] an athlete or other user to maintain records of exercises performed during an exercise regimen or other program so that the user can determine whether the user's physical capabilities are improving."  *Id.*, 2:41-46.

60.     The Buried References are material to the patentability of the claims of the '268 and '214 Patents.  In fact, the PTAB has instituted IPR proceedings on both patents on the grounds that their claims are invalid as obvious in view of Verstegen, Keiser I, and Keiser II.  D.I. 141, Ex. 1 (IPR2022-00955 ('214 Patent), Paper 6); Ex. 2 (IPR2022-00954 ('268 Patent), Paper 6).  Tonal's IPR Petitions—which are incorporated herein and attached as Exs. 19 and 20—explain in detail why these references are material to the patentability of claims of the '268 and '214 Patents, respectively.  iFIT made no effort to oppose institution of either IPR proceeding.

61.     iFIT and its outside counsel have been aware of the Buried References since at least October 2, 2018, when iFIT filed two Information Disclosure Statements, each identifying Verstegen, Keiser I, and Keiser II (or their published patent applications), in support of parent applications to the '268 and '214 Patents, respectively.  Ex. 21 (excerpt of IDS submitted in support of Appl. No. 15/472954, a parent application to the '268 patent, filed by Tonal in IPR2022-00954: identifying the published application that issued as Keiser I (Cite No. 1410, Pub. No. 2010/0137114), Verstegen (Cite No. 1329), and Keiser II (Cite No. 3751)); Ex. 22 (excerpt of IDS submitted in support of Appl. No. 15/976496, a parent application to the '214 patent, filed by Tonal in IPR2022-00955:  identifying the published application that issued as Keiser II (Cite No. 466, Pub. No. 2005/0239615[5]), Verstegen (Cite No. 1330), and the published application that issued as

---

[5] The disclosure statement misstates the publication number as 2005/023961*2*, but correctly states the publication date (2005-10-27) and patentee (Keiser, Dennis L).

Keiser I (Cite No. 1411)).  The published applications that issued as Keiser I and Keiser II contain substantially similar disclosures to Keiser I and Keiser II.

62.     Although the October 2, 2018 disclosure statements were submitted by Richard K.C. Chang II (on information and belief, in-house counsel for iFIT), Mr. Gadd of Maschoff Brennan was heavily involved in the prosecutions of those applications.  For example, Mr. Gadd submitted the initial applications, iFIT's remarks accompanying amendments, and other disclosure statements and references.

63.     iFIT did not re-submit any of the Buried References during prosecution of the December 2020 Applications.  Although iFIT was not required to re-submit references from the parent application prosecutions, it chose to re-submit many of the previously-submitted references—but omitted the Buried References.

64.     iFIT's omission of the Buried References was a deliberate decision made to ensure that the examiner would not, in fact, consider those references.  It is obvious from a cursory review of the references iFIT chose to re-submit that the Buried References were omitted in bad faith.  Many of the references iFIT chose to re-submit are clearly irrelevant to the purported inventions claimed in the December 2020 Applications, including:

        a.     A baseball-pitching machine (U.S. Patent No. 4,883,272);

        b.     A treadmill fan (U.S. Patent No. 5,102,380);

        c.     A treadmill adjustable incline system (U.S. Patent Nos. 4,913,396 and 5,029,801);

        d.     A rudimentary seated exercise device from the 1970s (U.S. Patent No. 4,300,760);

        e.     A treadmill cushioning system (U.S. Patent No. 6,174,267)

f.      A new frame for treadmill belts intended to prevent undue wear on the treadmill (U.S. Patent No. 6,123,646)

g.      A collapsible elliptical machine (U.S. Patent No. 6,030,320)

h.      An underwater treadmill (U.S. Patent No. 5,921,892)

i.      A spring structure intended to provide cushioning when using a treadmill (U.S. Patent No. 5,827,155)

j.      Another structure to provide cushioning when using a treadmill (U.S. Patent No. 5,279,528)

65.     The only reason iFIT would have re-submitted such nonresponsive references, while withholding the Buried References, is to overwhelm the examiner such that he is unable to properly consider any of the submitted references—particularly references that were previously submitted in a parent application and not re-submitted in the applications before him.

### UNENFORCEABILITY OF THE '268 AND '214 PATENTS

66.     As explained above and herein, iFIT, through its in-house and outside counsel, including at least Mr. Chang and Mr. Gadd, deliberately omitted the Buried References from its disclosures during prosecution of the '268 and '214 Patents, knowing such references were material to the patentability of the applied-for claims, with the specific intent to deceive the Patent Office.

### iFIT Knew the Buried References Were Material to Patentability

67.     iFIT's in-house counsel, Mr. Chang, knew of the Buried References by at least October 2018, when he submitted Information Disclosures Statements identifying them in the prosecutions of parent applications to the '268 and '214 Patents.

68.     On information and belief, iFIT's outside counsel, Mr. Gadd, also knew of the

Buried References at or around the same time, through his involvement in the prosecutions of these patent families—including arguing before the PTAB in support of the patentability of related patents and submitting the initial application, disclosure statements, and references in these specific applications.

69.     In October 2018, all of the issued and applied-for claims in the '268 and '214 Patent families required a magnetic resistance mechanism to provide resistance to a user.  This magnetic resistance element was a key component of the purported invention described in the patent families.  Mr. Gadd was well aware of that fact:  at the August 2018 hearing before the PTAB in the Nautilus IPR proceedings, Mr. Gadd repeatedly argued to the PTAB that the magnetic resistance mechanism was a core component of the purported invention of the '276 Patent (related to the '268 Patent).  Indeed, he expressly stated that "[t]his is what [iFIT's] inventors invented. They came up with a pulley cable machine that uses a flywheel ***and a magnetic braking mechanism, but not just any magnetic braking mechanism, a pivoting arm magnetic braking mechanism***."  IPR Hearing Tr. at 72:12-15 (emphasis added).  And he never disputed the PTAB's findings—in the proceedings for the '276 Patent or '047 Patent (related to the '214 Patent)—that the magnetic resistance mechanism was integral to the claimed inventions.  Nor could Mr. Gadd have disputed those findings, because every claim in the patent families expressly required a magnetic resistance mechanism.

70.     In late November and early December 2018, the PTAB issued final written decisions in the '276 and '047 Patent IPR proceedings invalidating all of the claims of the '276 Patent and some of the claims of the '047 Patent.

71.     Undeterred by the PTAB's decisions, iFIT continued to file new applications in the '268 and '214 Patent families.  iFIT filed new continuation applications in the '268 Patent family

on May 6, 2019 (Appl. No. 16/404,413) and July 8, 2020 (Appl. No. 16/923,275), and new continuation applications in the '214 Patent family on January 25, 2019 (16/258,356) and August 31, 2020 (17/008,148).  Each of those applications sought (and later obtained) claims that required a magnetic resistance mechanism.

72.     On August 21, 2020, iFIT sent a letter to Tonal asserting infringement of the '925 Patent (related to the '268 Patent) and the '767 Patent (related to the '214 Patent).  The letter was sent on behalf of iFIT by its litigation counsel in this action, who at the time was an attorney with Maschoff Brennan.  On information and belief, iFIT's litigation counsel and Mr. Gadd were familiar with each other, and discussed their work for iFIT, at least by virtue of both being attorneys at the Maschoff Brennan firm.

73.     On September 8, 2020, Tonal filed its declaratory judgment complaint against iFIT, which explained that Tonal does not infringe the '925 and '767 Patents at least because its strength training device does not include the claimed magnetic resistance mechanism.

74.     On September 29, 2020, iFIT's litigation counsel (Maschoff Brennan) sent Tonal a letter acknowledging that it understood that Tonal was arguing it did not infringe the '925 and '767 Patents at least because the accused product does not meet the magnetic resistance claim limitations.

75.     On December 8, 2020, Mr. Gadd filed the applications that would issue as the '268 and '214 Patents (the December 2020 Applications).  For the first time in either patent family, iFIT sought claims that did *not* require a magnetic resistance mechanism.  On information and belief, the applications were prosecuted by iFIT's in-house and outside counsel, including Mr. Chang and Mr. Gadd.  Although the few documents filed during prosecution of the December 2020 Applications were filed by Mr. Gadd, on information and belief, Mr. Chang, as in-house counsel

for iFIT and having been substantively involved in the prosecution of these patent families, also participated substantively in the prosecution of the December 2020 Applications in concert with his outside counsel.

76.     On information and belief, iFIT (including Mr. Chang and Mr. Gadd) filed the December 2020 Applications seeking claims without the magnetic resistance limitations because iFIT knew from its litigation counsel (Mr. Gadd's colleagues at Maschoff Brennan) that Tonal had sought declaratory judgment of non-infringement of related iFIT patents based in part of those limitations.  iFIT (through at least Mr. Chang and Mr. Gadd) thus filed the December 2020 Applications to obtain claims without the magnetic resistance limitations, in order to allow iFIT (through Mr. Gadd's colleagues) to assert those new claims against Tonal.  And that is exactly what happened:  shortly after the '268 and '214 Patents issued without the magnetic resistance limitations, iFIT filed suit against Tonal asserting infringement of those patents.  (C.A. No. 21-652, D.I. 1).

77.     Having argued to the PTAB that the magnetic resistance limitations were integral to the purported novelty of the inventions in these patent families, Mr. Gadd was well aware that claims without the magnetic resistance limitations would likely be invalid over the prior art.  On information and belief, Mr. Chang was also aware of that fact because, as in-house counsel for iFIT and having been substantively involved in the prosecution of these patent families, he was informed of the PTAB proceedings by his outside counsel pursuant to his outside counsel's professional duties.

78.     iFIT (including Mr. Chang and Mr. Gadd) was also aware of the Buried References because they were submitted (by Mr. Chang) in iFIT's related patent applications that both Mr. Chang and Mr. Gadd helped to prosecute.  On information and belief, iFIT (including Mr. Chang

and Mr. Gadd) knew the Buried References were less relevant to the pending claims at the time, which included the magnetic resistance limitations, because the Buried References did not expressly disclose those limitations.  But, as explained in Tonal's IPR Petitions—which iFIT did not oppose and the PTAB has instituted proceedings on—the Buried References are clearly material to the patentability of the '268 and '214 Patent claims, which no longer include the magnetic resistance limitations.

79.     Therefore, on information and belief, iFIT (including Mr. Chang and Mr. Gadd), being familiar with the Buried References, and having dropped a key limitation from the '268 and '214 Patent claims that was not expressly disclosed by the Buried References, knew the Buried References were material to the patentability of the '268 and '214 Patent claims while prosecuting those patents.

**iFIT Omitted the Buried References with the Specific Intent to Deceive the Patent Office**

80.     As explained above, iFIT (including Mr. Chang and Mr. Gadd) disclosed the Buried References to the Patent Office during prosecution of parent applications to the '268 and '214 Patents when all the claims in those patent families required a magnetic resistance mechanism. But after learning of Tonal's non-infringement position based on the magnetic resistance limitations, iFIT filed new continuation applications (which led to the '268 and '214 Patents) seeking claims without those limitations to assert against Tonal.

81.     In its desire to obtain claims to assert against Tonal, iFIT (including Mr. Chang and Mr. Gadd), intentionally hid the Buried References among thousands of references, many of which were irrelevant.  iFIT submitted over 10,000 references in the preceding applications of the '268 Patent family, and over 9,000 references in the preceding applications of the '214 Patent family— all of which were considered submitted in the December 2020 Applications.  In addition, iFIT also

submitted over 1,100 references during prosecution of each of the December 2020 Applications. Mr. Chang and Mr. Gadd personally submitted many of those references, and were otherwise involved in those prosecutions.

82.     iFIT did not submit these references for the benefit of the examiner; that is obvious from the fact that the bulk of the references are not responsive to the applied-for claims.  As explained above, iFIT's disclosures included references directed to tee-ball stands (US Patent Nos. 4,938,478, 4,830,371, 4,681,318), methods for improved semiconductor manufacturing (U.S. Patent No. 5,393,690), lead-free alloy solder (U.S. Patent No. 6,563,225), a portable hot tub (U.S. Patent No. 6,003,166), a system for practicing Taekwondo (U.S. Application No. 2016/0303453), and an improved automatic transmission for cars (U.S. Patent No. 6,547,698).  Thus, it appears that iFIT (including Mr. Chang and Mr. Gadd) submitted these references during prosecution of the December 2020 Applications with the specific intent of deceiving the Patent Office—namely, to overwhelm the examiner, who could not possibly review thousands of references in the limited time allotted to the prosecution of any one application, and to distract him from the material Buried References with a flood of irrelevant disclosures.  Michael D. Frakes & Melissa F. Wasserman, *Is the Time Allocated to Review Patent Applications Inducing Examiners to Grant Invalid Patents?: Evidence from Micro-Level Application Data*, 99 Rev. Econ. & Stat. 550 (2017) ("[O]n average, an examiner spends only nineteen hours reviewing an application, including reading the patent application, searching for prior art, comparing the prior art with the patent application, writing a rejection, responding to the patent applicant's arguments, and often conducting an interview with the applicant's attorney.").

83.     But that is not all.  iFIT (including Mr. Chang and Mr. Gadd) specifically omitted the Buried References from its disclosures during prosecution of the December 2020 Applications.

Although the Buried References are considered submitted because they were submitted in a prior prosecution, iFIT re-submitted many of the references that were previously submitted with the Buried References.  If iFIT had simply re-submitted all of its prior references *en masse*, it would have also re-submitted the Buried References.  Instead, iFIT intentionally and specifically withheld the Buried References, while re-submitting many of its prior references.  Moreover, as explained above, the re-submitted references were also largely irrelevant to the applied-for claims, including references directed to a baseball pitching machine (U.S. Patent No. 4,883,272), a treadmill fan (U.S. Patent No. 5,102,380), and a treadmill adjustable incline system (U.S. Patent Nos. 4,913,396 and 5,029,801).  As a result, iFIT increased the volume of disclosures in the December 2020 Applications, while staying silent regarding the Buried References, to further maximize the chances that the examiner would not, in fact, consider the Buried References in assessing the patentability of the '268 and '214 Patent claims.

84.     iFIT's deceptive tactics were successful.  The examiner did not issue any rejections of the applied-for claims over the prior art.  In fact, just weeks after iFIT's disclosures, the examiner allowed the claims in both December 2020 Applications.  iFIT then promptly brought this action against Tonal, asserting its newly issued claims without the magnetic resistance limitations.

**<u>COUNTERCLAIM I</u>**
**Declaratory Judgment of Non-Infringement of the '268 Patent**

9.85.   Tonal restates and incorporates by reference the allegations in the preceding paragraphs of these Counterclaims as if fully set forth herein.

10.86.  Tonal has not infringed and does not infringe any claim of the '268 patent, either directly or indirectly, literally or under the doctrine of equivalents.

11.87.  A judicial determination of non-infringement is necessary and appropriate so that

Tonal may ascertain its rights regarding the '268 patent.

**COUNTERCLAIM II**
**Declaratory Judgment of Invalidity of the '268 Patent**

~~12.~~88.  Tonal restates and incorporates by reference the allegations in the preceding paragraphs of these Counterclaims as if fully set forth herein.

~~13.~~89.  One or more of the claims of the '268 patent are invalid under 35 U.S.C. §§ 102 and/or 103 as anticipated and/or obvious in view of existing prior art. Further, one or more of the claims the '268 patent fail to meet the requirements of 35 U.S.C. §§101 and/or 112, and are at least indefinite and lack written description and are not enabled for failing to describe and enable the full scope of the claims.  Further, one or more of the claims of the '268 patent are invalid under the doctrine of obviousness-type double patenting.

~~14.~~90.  A judicial determination of invalidity is necessary and appropriate so that Tonal may ascertain its rights regarding the '268 patent.

**COUNTERCLAIM III**
**Declaratory Judgment of Non-Infringement of the '214 Patent**

~~15.~~91.  Tonal restates and incorporates by reference the allegations in the preceding paragraphs of these Counterclaims as if fully set forth herein.

~~16.~~92.  Tonal has not infringed and does not infringe any claim of the '214 patent, either directly or indirectly, literally or under the doctrine of equivalents.

~~17.~~93.  A judicial determination of non-infringement is necessary and appropriate so that Tonal may ascertain its rights regarding the '214 patent.

**COUNTERCLAIM IV**
**Declaratory Judgment of Invalidity of the '214 Patent**

~~18.~~94.  Tonal restates and incorporates by reference the allegations in the preceding paragraphs of these Counterclaims as if fully set forth herein.

38

19.95.  One or more of the claims of the '214 patent are invalid under 35 U.S.C. §§ 102 and/or 103 as anticipated and/or obvious in view of existing prior art. Further, one or more of the claims of the '214 patent fail to meet the requirements of 35 U.S.C. §§101 and/or 112, and are at least indefinite and lack written description and are not enabled for failing to describe and enable the full scope of the claims. Further, one or more of the claims of the '214 patent are invalid under the doctrine of obviousness-type double patenting.

20.96.  A judicial determination of invalidity is necessary and appropriate so that Tonal may ascertain its rights regarding the '214 patent.

### COUNTERCLAIM V
### Declaratory Judgment of Unenforceability of the '268 Patent

97.     Tonal restates and incorporates by reference the allegations in the preceding paragraphs of these Counterclaims as if fully set forth herein.

98.     The '268 Patent is unenforceable due to inequitable conduct for the reasons stated above, including because iFIT, through its in-house and outside counsel, deliberately omitted the Buried References from its disclosures during prosecution of the '268 Patent, knowing such references were material to the patentability of the applied-for claims, with the specific intent to deceive the Patent Office.

99.     A judicial determination of unenforceability is necessary and appropriate so that Tonal may ascertain its rights regarding the '268 Patent.

### COUNTERCLAIM VI
### Declaratory Judgment of Unenforceability of the '214 Patent

100.    Tonal restates and incorporates by reference the allegations in the preceding paragraphs of these Counterclaims as if fully set forth herein.

101.    The '214 Patent is unenforceable due to inequitable conduct for the reasons stated

above, including because iFIT, through its in-house and outside counsel, deliberately omitted the Buried References from its disclosures during prosecution of the '214 Patent, knowing such references were material to the patentability of the applied-for claims, with the specific intent to deceive the Patent Office.

102.   A judicial determination of unenforceability is necessary and appropriate so that Tonal may ascertain its rights regarding the '214 Patent.

**PRAYER FOR RELIEF**

WHEREFORE, Tonal respectfully requests that the Court enter judgment in favor of Tonal and award the following relief:

A.      Declaratory judgment that Tonal has not infringed and does not infringe any valid and enforceable claim of the '268 patent or the '214 patent;

B.      Declaratory judgment that the claims of the '268 and '214 patents are invalid and/or unenforceable;

C.      Declaratory judgment that the '268 and '214 patents are unenforceable for inequitable conduct;

C.D.   Declaratory judgment that iFIT recover nothing from Tonal;

D.E.   Dismissal with prejudice of all claims in the FAC against Tonal;

E.F.   A finding that this is exceptional pursuant to 35 U.S.C. § 285 and an award to Tonal of its attorneys' fees and costs; and

F.G.   Any further necessary and proper relief as this Court may deem just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

_____
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com

*Attorneys for Tonal Systems, Inc.*

OF COUNSEL:

Daralyn J. Durie
Timothy C. Saulsbury
Bethany D. Bengfort
Andrew L. Perito
~~Nari E.~~Joyce C. ~~Ely~~Li
~~DURIE TANGRI~~MORRISON & FOERSTER LLP
~~217 Leidesdorff~~425 Market Street
San Francisco, CA  ~~94111~~94105
(415) 268-7000


~~April~~January 13, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on January 13, 2023, upon the following in the manner indicated:

Frederick L. Cottrell, III, Esquire                    *VIA ELECTRONIC MAIL*
Christine D. Haynes, Esquire
Valerie A. Caras, Esquire
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, DE  19801
*Attorneys for iFIT, Inc.*

David R. Wright, Esquire                    *VIA ELECTRONIC MAIL*
Alexis K. Juergens, Esquire
FOLEY & LARDNER LLP
299 South Main Street, Suite 2000
Salt Lake City, UT  84111
*Attorneys for iFIT, Inc.*

Michael R. Houston, Esquire                    *VIA ELECTRONIC MAIL*
FOLEY & LARDNER LLP
321 North Clark Street, Suite 3000
Chicago, IL  60654
*Attorneys for iFIT, Inc.*

/s/ Jennifer Ying
_____
Jennifer Ying (#5550)