## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TONAL SYSTEMS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-1197-GBW-CJB |
| | ) | CONSOLIDATED |
| | ) | |
| IFIT INC., | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

In this consolidated patent action filed by Plaintiff Tonal Systems, Inc. ("Tonal" or

"Plaintiff") against Defendant iFIT Inc. ("iFIT" or "Defendant"), iFIT alleges that Tonal

infringes United States Patent Nos. 10,709,925 (the "'925 patent"), 10,953,268 (the "'268

patent"), 10,758,767 (the "'767 patent"), and 10,967,214 (the "'214 patent" and collectively with

the other patents, "the asserted patents" or the "patents-in-suit").  Presently before the Court is

the matter of claim construction.  (D.I. 191; D.I. 192)  The Court recommends that the District

Court adopt the constructions set forth below.

## I.    BACKGROUND

Tonal commenced Civil Action No. 20-1197 against iFIT on September 8, 2020, seeking

a declaratory judgment of non-infringement as to the '925 patent and the '767 patent.  (D.I. 1)  On

May 5, 2021, iFIT[1] brought Civil Action No. 21-652, asserting that Tonal infringes the '268

---

[1]      In both cases, Tonal's original adversary was ICON Health & Fitness, Inc. ("ICON"), but ICON later changed its name to iFIT Inc. in August 2021, and the case captions were then amended accordingly.  (D.I. 25; Civil Action No. 21-652-GBW-CJB, D.I. 16)

patent and the '214 patent.  (Civil Action No. 21-652-GBW-CJB, D.I. 1)[2]  Both cases were thereafter referred to the Court by then-District Judge Leonard P. Stark to hear and resolve all pretrial matters up to and including expert discovery matters, (D.I. 29; Civil Action No. 21-652-GBW-CJB, D.I. 20), and were later again referred to the Court for those purposes by now-presiding District Judge Gregory B. Williams, (D.I. 118; Civil Action No. 21-652-GBW-CJB, D.I. 54).  The cases were consolidated into the instant action on February 14, 2022.  (D.I. 58)

The cases were stayed for a time at the parties' joint request.  (D.I. 140)  But after that stay expired, (D.I. 142), and after the Court denied Tonal's request for an additional stay, (D.I. 188), the previously-delayed claim construction process moved forward.  The Court conducted a *Markman* hearing on February 14, 2023.  (D.I. 212 (hereinafter, "Tr."))

The patents-in-suit relate to exercise machines that have various claimed aspects, including electromagnetic or magnetic components.  To the extent that particular facts regarding these claimed devices and the patents-in-suit are relevant to claim construction, the Court will set those out in Section III.

## II.   STANDARD OF REVIEW

The Court has previously set out the law regarding claim construction in many opinions, including in *Virco Mfg. Corp. v. SSI Liquidating, Inc.*, Civil Action No. 20-906-LPS-CJB, 2022 WL 1184060, at *1-2 (D. Del. Apr. 21, 2022).  The Court hereby incorporates by reference its discussion in *Virco* of these legal standards and will follow them herein.  To the extent that consideration of the disputed terms necessitates discussion of other, related legal principles, the Court will discuss those principles in Section III below.

---

[2]      The '925 patent and the '268 patent share a specification and belong to the same patent family; similarly, the '767 patent and the '214 patent share a specification and belong to the same patent family.  (D.I. 119 at 1)

2

## III.    DISCUSSION

By the time of the claim construction hearing, the parties had disputes over five claim terms found in one or more of the patents-in-suit.  The Court considers the disputes over four of those terms to be live and ready for decision here.  It will take up the four terms in the order in which they were argued.[3]

### A.    "electromagnetic unit" ('767 patent and '214 patent) and "magnetic mechanism" ('925 patent and '268 patent)

The parties agree that first two disputed terms, "electromagnetic unit" and "magnetic mechanism[,]" should be taken up together.

"Electromagnetic unit" is found in various claims of the '767 patent and '214 patent, including independent claim 1 of the '767 patent, which is representative for our purposes here.  Claim 1 of the '767 patent is a claim to a cable exercise machine, and it states that the machine has "an *electromagnetic unit* linked to the first pull cable and to the second pull cable, the *electromagnetic unit* configured to apply one or more levels of resistance to a user pulling on the first pull cable and/or the second pull cable[.]"  ('767 patent, col. 13:8-12 (emphasis added))

"Magnetic mechanism" is found in various claims of the '925 patent and '268 patent, including representative independent claim 1 of the '925 patent.  There the claimed strength

---

[3]    For the reasons expressed by the Court at the *Markman* hearing, with regard to the fifth term—"force exerted by the user"—the parties did not sufficiently identify and meaningfully address their true disputes during the claim construction briefing process.  (Tr. at 129-31, 136, 142-45, 173-74)  The Court therefore concludes that any disputes regarding this term are not ripe; for that reason, it will not address the term herein.  After further meeting and conferring, if the parties believe that a material dispute still remains as to this term in the future, then by no later than 21 days prior to the summary judgment motion filing deadline, the parties should advise the Court of this.  The parties should also then let the Court know whether this term is expected to be relevant to any issues that will be raised in the forthcoming summary judgment briefing.  Thereafter, if needed, the Court will set out a further process for resolving any remaining claim construction disputes regarding the term.

training apparatus comprises, *inter alia*, a "*magnetic mechanism* coupled to the first cable and the second cable and configured to provide multiple levels of resistance to a user pulling on the first cable and/or the second cable[.]"  ('925 patent, col. 14:29-32 (emphasis added))

The parties' competing proposed constructions for "electromagnetic unit" and "magnetic mechanism" are set out in the chart below:

| Term | iFIT's Proposed Construction | Tonal's Proposed Construction |
|---|---|---|
| "electromagnetic unit" | Not subject to 35 U.S.C. § 112(f) ("Section 112"). <br><br> To the extent a plain and ordinary meaning is needed, "a unit having at least one electromagnet." | A means-plus-function term under Section 112. <br><br> **Function**:  applying one or more levels of resistance to a user pulling on the [] cable. <br><br> **Corresponding structure**:  a flywheel with an electromagnetic eddy current brake. |
| "magnetic mechanism" | Not subject to Section 112. <br><br> To the extent a plain and ordinary meaning is needed, "a mechanism having at least one magnetic element." | A means-plus-function term under Section 112. <br><br> **Function**:  providing multiple levels of resistance to the user pulling on the [] cable. <br><br> **Corresponding structure**:  a flywheel with an eddy current brake. |

(D.I. 119 at 18, 36)

As the parties did during the *Markman* hearing, the Court will use the "electromagnetic unit" term as the primary driver for the arguments here, since the issues and disputes relating to that term and the "magnetic mechanism" term are very similar.  (Tr. at 42)  The key threshold

disputed issue as to "electromagnetic unit" (just as it is with "magnetic mechanism") is whether the term is a means-plus-function term subject to 35 U.S.C. § 112(f).[4]  (*Id.* at 6)

Given that the claims do not use the traditional "means" language often found in means-plus-function claims, "there is a rebuttable presumption that [Section 112(f)] does not apply" as to both terms at issue.  *Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*, 899 F.3d 1291, 1298 (Fed. Cir. 2018).  "[T]he presumption can be overcome and [Section 112(f)] will apply if the challenger [here Tonal] demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that

---

[4]    Section 112(f) provides that "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  35 U.S.C. § 112(f).  The "means-plus-function" technique of claim drafting is a "convenience" that allows a patentee to express a claim limitation in functional terms "without requiring the patentee to recite in the claims all possible structures" that could perform that function.  *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003) (internal quotation marks and citation omitted).  In exchange for getting the benefit of this drafting convenience, however, patentees must disclose, in the written description of the patent, a corresponding structure for performing the claimed function.  *Noah Sys, Inc. v. Intuit Inc.*, 675 F.3d 1302, 1318 (Fed. Cir. 2012); *see also Elekta*, 344 F.3d at 1211 ("[T]he price that must be paid for use of that convenience is limitation of the claim to the means specified in the written description and equivalents thereof.") (internal quotation marks and citation omitted).  A patentee satisfies this requirement "'only if the specification or prosecution history *clearly links or associates* that structure to the function recited in the claim.'"  *In re Aoyama*, 656 F.3d 1293, 1297 (Fed. Cir. 2011) (emphasis added) (quoting *Elekta*, 344 F.3d at 1210); *see also Elekta*, 344 F.3d at 1220.  "If the specification does not contain an adequate disclosure of the structure that corresponds to the claimed function, the patentee will have failed to particularly point out and distinctly claim the invention as required by . . . section 112[], which renders the claim invalid for indefiniteness."  *Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371, 1382 (Fed. Cir. 2009) (internal quotation marks and citation omitted).

Construing a means-plus-function limitation is a two-step process.  The first step is determining the claimed function of the limitation.  *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1351 (Fed. Cir. 2015); *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001).  The second step is identifying the corresponding structure disclosed in the specification and equivalents thereof.  *Williamson*, 792 F.3d at 1351; *Medtronic, Inc.*, 248 F.3d at 1311.

function." *Id.* (internal quotation marks and citations omitted).  The challenger must meet this

burden by a preponderance of the evidence.  *See Apex Inc. v. Raritan Comput., Inc.*, 325 F.3d

1364, 1372-73 (Fed. Cir. 2003).  "To determine whether a claim recites sufficient structure, it is

sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art

['POSITA'] to designate structure, even if the term covers a broad class of structures and even if

the term identifies the structures by their function." *Skky, Inc. v. MindGeek, s.a.r.l.*, 859 F.3d

1014, 1019 (Fed. Cir. 2017) (internal quotation marks and citation omitted).

For the following reasons, the Court concludes that Tonal has not met its burden to

demonstrate, by a preponderance of the evidence, that the claims fail to recite sufficiently define

structure for "electromagnetic unit."  The Court does so for the following reasons:

- iFIT's expert Scott Ganaja opined that a POSITA would have understood "electromagnetic unit" to be referring to a sufficiently definite structure—that is, a unitary structure that contains at least one electromagnet.  (D.I. 120 at JA007)[5]  Mr. Ganaja goes on to list two contemporaneous patents that use the term "electromagnetic unit" as having this meaning—one that describes it as an "electromagnetic coil and a magnet" and another that defines it as a unit that "includes an electromagnet."  (*Id.* (internal quotation marks omitted); *see also id.* at JA144; *id.* at JA182)

- The term "electromagnetic unit" is also not used in a vacuum. In claim 1 of the '767 patent, for example, the "electromagnetic unit" must be, *inter alia*, linked to the first pull cable and to the second pull cable of a cable exercise machine.  The location of the unit in question, then, also provides some additional description of the type of structure required—i.e., not just any unit containing an electromagnet, but one that can be linked to multiple pull cables so as to provide the requisite levels of resistance.  *See Cole v. Kimberly-Clark Corp.*, 102 F.3d 524,

---

[5]     Contrary to Tonal's argument during the *Markman* hearing, (Tr. at 57-59), the Court understands this portion of Mr. Ganaja's declaration to be opining that "electromagnetic unit" is in fact a name for a class of structures—structures that are units and that include at least one electromagnet.

531 (Fed. Cir. 1996) (concluding that the use of the term "perforation means . . . for tearing" did not implicate means-plus-function claiming, in part because the claim not only described the structure that supported the tearing function, but it also described its location—i.e., that it had to extend "from the leg band to the waist band"); *see also* Tr. at 86-87)

- And though Tonal's expert, Harvey Voris, disagrees that a POSITA would understand the term to be a name for a sufficiently definite structure, he was able to list various types of structures (including electromagnetic eddy current brakes, electromagnetic particle breaks, and electric motors or generators) that would fall within the relevant category.  (D.I. 120 at JA311)  Mr. Voris' main concern seems to be that the types of structures that that would qualify as "electromagnetic units" "var[y] widely."  (*Id.*; *see also* Tr. at 60 (Tonal's counsel noting that a "wildly broad set of different structures" would fall into iFIT's definition of "electromagnetic unit"))  Yet as the Court noted above, a term can recite sufficiently definite structure even if it covers a *very broad class of structures*.  So this is surely no hinderance here.  (D.I. 119 at 40-41 (citing cases)); *see also Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1361 (Fed. Cir. 2004) ("While the terms 'connector' and 'connector assembly' are certainly broad, and may in the end include any structure that performs the role of connecting, the same could be said of numerous other terms, such as 'clamp,' or 'clip[.]'"), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015); *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996) ("It is true that the term 'detent' does not call to mind a single well-defined structure, but the same could be said of other commonplace structural terms, such as 'clamp' or 'container.'").[6]

---

[6]     It is true, as Tonal notes, that the term "electromagnetic unit" includes the word "unit."  And it is also true that the United States Court of Appeals for the Federal Circuit has found that "unit" is a nonce word that, standing alone, does not connote any particular structure.  *Diebold Nixdorf*, 899 F.3d at 1296, 1301.  But of course here, the term at issue is "electromagnetic unit," not "unit."  Simply because a two-word term includes one word that, standing alone, amounts to a nonce word, that does not mean that the term itself cannot connote sufficiently definite structure.  *See Cole*, 102 F.3d at 531 (concluding that the use of the term "perforation means . . . for tearing" did not transform the claim element at issue into a means-plus-function element, in part because the term sufficiently described the structure that supports the tearing function).

Having determined that the claims' use of "electromagnetic unit" does not implicate Section 112(f), the Court will construe the term to mean "a unit having at least one electromagnet," as iFIT has proposed.  Tonal has not separately argued that, if its Section 112(f) arguments fail, then iFIT's proposed construction should be rejected for some other reason.  (Tr. at 73-74)

The analysis for "magnetic mechanism" follows essentially the same path as that for "electromagnetic unit."  Although "mechanism" is generally understood to be a nonce word, *Media Rights Techs., Inc. v. Cap. One Fin. Corp.*, 800 F.3d 1366, 1373 (Fed. Cir. 2015), Tonal has not met its burden to demonstrate that the term "magnetic mechanism" fails to identify sufficiently definite structure.  This is so for many reasons, including:  (1) iFIT's expert Mr. Ganaja stated that a POSITA would have understood the term to be referring to a sufficiently definite structure, that is, a "mechanism having at least one magnetic element"; (2) the claims provide some additional indication of structure, in that they require the mechanism to be of a type such that it could be coupled to two different cables, in order to provide levels of resistance to people pulling on the cables; (3) the specification underscores the applicability of these guideposts, as it notes that a "magnetic mechanism" may include a "plurality of magnets arranged to provide [] desired magnetic flux"; and (4) contemporaneous patents use the term to describe similar structures, such as a magnetic arch, a u-bar magnet, magnetic plates, a magnetic roller, or a magnetic clip.  ('925 patent, col. 5:4-8; D.I. 120 at JA005, JA087)  Though the form of elements making up the claimed "magnetic mechanism" might "var[y] widely[,]" (D.I. 120 at JA304), again, that is not necessarily a barrier to avoiding application of Section 112(f).  In light of this, and with Tonal not otherwise disputing the accuracy of iFIT's proposed construction for

this term ("a mechanism having at least one magnetic element"), the Court will also recommend that that construction be adopted here.

**B.** **"tower" ('925 patent and '767 patent)**

The next disputed term, "tower," appears in various claims of the '925 patent and the '767 patent.  Even though those two patents belong to different families, the parties agree that a single construction of "tower" is appropriate.  The term's use in claim 1 of the '925 patent is representative; there the claimed strength training apparatus comprises "a tower" that includes various other components (i.e., arms, pulleys, cables, a control panel and more).  ('925 patent, col. 14:17-43)  The parties' proposed constructions are as follows:

| Term | iFIT's Proposed Construction | Tonal's Proposed Construction |
|------|------------------------------|-------------------------------|
| "tower" | "an upright structure that helps support various components of the exercise apparatus" | "an upright structure that is supported by a base" |

(D.I. 119 at 42; D.I. 131 at 2)

The key dispute here is over whether, as Tonal argues, a "tower" must be supported by a base.  (D.I. 119 at 44-45; Tr. at 94)  According to Tonal, a tower must be connected to a base such that it is "supported from the bottom"; iFIT, in contrast, argues that a tower could be supported in other ways, including via "flat relief" that comes from a "wall or doorway[.]"  (Tr. at 94)[7]

---

[7]     The parties are apparently having this fight because the accused product is mounted on a wall.  (Tr. at 95, 108)

Although both sides have material to use in their favor, the Court ultimately agrees with iFIT that a "tower" need not absolutely be "supported by a base."  It so concludes for the following reasons:

- It is true, as Tonal notes, (*id.* at 96), that the patents' specifications describe and depict all of the identified embodiments of the claimed apparatus as having a "tower" that extends "upward from[] the base member" and thus is supported by that base member, ('925 patent, col. 4:24-27; *see, e.g., id.*, FIGS. 1-3; D.I. 119 at 48; Tr. at 100-01, 123).  But the United States Court of Appeals for the Federal Circuit has "repeatedly warned against confining the claims to [the specific] embodiments" set out in the specification.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005); *see also Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1345 (Fed. Cir. 2009).

- More importantly, it is the claims that claim.  Here, the patentee made a choice not to claim an apparatus that had a "tower" that must be supported by a "base."  (Tr. at 96 (Tonal's counsel noting that the claims "do not include a base member, and they do not include any limitation as to how a tower needs to be supported"))  Indeed, the relevant claims do not mention the word "base" at all.  (*Id.* at 97, 102)  This seems to have been a conscious choice by the patentee, since, as noted above, the specification at times discusses the utilization of a separate "base member" that is connected to a "tower" in certain embodiments.  (*See, e.g.*, '925 patent, col. 4:24-27)  So the patentee knew how a base could be utilized as part of an invention like this one.  And it surely knew how to claim a base that supports a tower if it had wanted to do so.  It simply chose not to do so.  It would be strange for the Court to now require that the claimed apparatus must in fact be supported by a base (via the construction of "tower") in light of how these claims were actually drafted.  (Tr. at 102-03)[8]

---

[8]        In their briefing, the parties spent a lot of time arguing about whether a prior art apparatus known as the "Tower 200," which can be hung over a door for support (and thus does not require a supporting base), does or does not bolster iFIT's argument.  (D.I. 119 at 43-44, 47-51)  In the Court's view, however, this piece of evidence does not move the needle significantly.  In part that is because even though the device was called the "Tower 200," it is unclear (and hotly disputed by the parties) as to whether it actually included the type of "tower" that is called for by the patents-in-suit here (i.e., one that includes an upright supporting structure).  (*Id.* at 47, 49, 50-51; Tr. at 124)  At best for iFIT, the Tower 200 is evidence that at least one prior art

- The part of Tonal's proposal construction at issue here seems a bit less desirable, in the sense that it seeks to define a "tower" not by reference to what a tower *is*, but instead by reference to some other piece of equipment that a tower is *connected to* (a "base"). Tonal acknowledges that a base is a separate piece of equipment that is distinct from a tower. (*Id.* at 118-19) As a general matter (though there can certainly be exceptions), it seems more appropriate to the Court to define a thing by what it comprises or what it is, not in terms of its relationship to some other thing.

- Tonal argued that if iFIT's construction was adopted, then this would render a dependent claim like claim 14 of the '214 patent superfluous. (D.I. 119 at 46) But the Court does not see why that is necessarily so. Claim 14 of the '214 patent recites the "cable exercise machine of claim **13**, wherein the frame comprises a tower." ('214 patent, col. 14:53-54) Tonal's argument seems to be that if there were no requirement that a "tower" be supported by a base, then "tower" and "frame" would not have any different meaning, rendering claim 14's use of both terms superfluous. (Tr. at 113) But as iFIT's counsel noted, the meaning of "tower" might well differ from that of "frame" in another way: "in that a frame doesn't necessarily have to be upright" or "have a height to it" (in the sense that a "frame" could be "sticking down on the floor"), whereas with a "tower," there "is an idea of extending vertically or going upwards[.]" (*Id.* at 105)

- The Court acknowledges that Tonal's expert Mr. Voris submitted a declaration stating that a POSITA would understand that a "'tower' is a commonly understood structure in exercise equipment" and that it, *inter alia*, "has a base that typically sits on the floor[.]" (D.I. 120 at JA313) Yet in explaining why this was so, Mr. Voris suggested that the use of "tower" in that field is "similar to the way the term [] is used in architecture[,]" and noted that some examples of famous towers that have a base "include the Eiffel [T]ower, the Leaning Tower of Pisa, and Big Ben." (*Id.*; *see also* D.I. 119 at 46) But the physics involved in crafting the Eiffel Tower seem pretty far afield from the particulars of how a home gym works. (D.I. 119 at 50) And iFIT's expert Mr. Ganaja disagreed with Mr. Voris' view, noting persuasively that while

---

exercise machine (albeit one nowhere mentioned in any of the patents-in-suit, nor by any of the cited references that are disclosed in the patents-in-suit) had a tower that was not supported by a base.

> "[b]uildings are very large structures [wherein it] is not feasible to support the weight of a building without being supported by the ground" the "same is not true for exercise equipment [in that] it is common for [such] equipment to be attached to a wall, rather than supported by the floor." (D.I. 120 at JA453) For these reasons, the Court did not find Mr. Voris' view on this issue to be persuasive.

- The patents say that one of the purposes of a "tower" is to allow the "ability to position the ends of the pull cables at a location above the user's head[.]" ('767 patent, col. 12:49-51) And as iFIT noted, it does seem that a "tower" without a base (i.e., one attached to a wall) could provide such support and fulfill such a function. (D.I. 119 at 48; Tr. at 122)

In sum, Tonal is the party seeking the narrower construction here, but the cumulative effect of the intrinsic and extrinsic evidence does not strongly support that reading. (Tr. at 116) The patentee should thus be entitled to the full breadth of its claims. *See TI Grp. Auto. Sys. (N. Am.), Inc. v. VDO N. Am., L.L.C.*, 375 F.3d 1126, 1138 (Fed. Cir. 2004); *Intellectual Ventures I LLC v. AT&T Mobility LLC*, C.A. No. 13-1631-LPS, 2015 WL 1393386, at *27 (D. Del. Mar. 24, 2015). Therefore, the Court will construe "tower" to mean "an upright structure that helps support various components of the exercise apparatus."

## C.    "a dial" ('767 patent and '214 patent)

The term "a dial" is found in claims of the '767 patent and the '214 patent. Exemplary claim 16 of the '767 patent includes the term. Claim 16 is dependent on claim 15, which states that the claimed cable exercise machine includes a control panel that receives input from the user allowing the user to adjust the level of resistance applied by an electromagnetic unit. ('767 patent, col. 14:50-54) Claim 16, in turn, requires that "the input from the user to adjust the level of resistance is received via *a dial*[.]" (*Id.*, col. 14:60-61 (emphasis added))

The parties' competing proposed constructions for the term are set out in the chart below:

12

| Term | iFIT's Proposed Construction | Tonal's Proposed Construction |
|------|------------------------------|-------------------------------|
| "a dial" | "a physical or digital representation of a plate or disk that is rotated to select a setting" | "a plate or disk that is rotated to select a setting" |

(D.I. 119 at 6; D.I. 131 at 1)  The key dispute regarding this term is whether "a dial" must be limited to a physical dial (as Tonal proposes) or whether it can include a digital representation of a dial (as iFIT suggests).  (Tr. at 148-50)

As with the prior term "tower," not much in the patent sheds light on what "a dial" is or can be.  And as it did with "tower," Tonal makes some good arguments in support of its proposed construction.  But here again, the Court agrees with iFIT that its broader construction is more appropriate.  The Court does so for the following reasons:

- As an initial matter, the few places in the patent where a dial is mentioned or depicted do not clearly show that only a physical dial can qualify.  For example, Tonal points for support to column 8 of the specification of the '767 patent, which states that the cable exercise machine described in one embodiment has a control panel that "may include various *input devices* (e.g., buttons, switches, *dials*, etc.) and *output devices* (e.g., LED lights, *displays*, alarms, etc." ('767 patent, col. 8:25-30 (emphasis added); *see also* Tr. at 151)  During the *Markman* hearing, Tonal argued that in column 8, an output device such as a "display[]" (which would presumably include digital representations of items) is being contrasted with an input device like a "dial"—such that a dial cannot be represented by a digital display item.[9]  However, the Court disagrees that this is the message that should be gleaned from this part of the specification.  Column 8 never flatly states that an input device cannot be represented digitally on a control panel.  (Tr. at 160)

---

[9]     Tonal did not make this particular argument about column 8 of the '767 patent in its briefing.  It should have, as Tonal was clearly advocating in its briefs that "a dial" should be understood to be a physical dial (i.e., not something that could be displayed on a touchscreen).  (D.I. 119 at 11)  For that reason, the Court could consider this argument about column 8 of the '767 patent to be waived.  However, the Court will address the substance of Tonal's argument here in order to explain why, even were it to be considered, it would not help Tonal.

And later in that column, the patentee further explains that input devices "may be used to . . . play an audio-visual program[.]" ('767 patent, col. 8:32-35)  Audio-visual programs can certainly be viewed digitally via a display.  So if dials or other input devices can play such a program, perhaps that means that those input devices themselves can also be represented digitally.  (Tr. at 161-62)  In any event, certainly this column of the patent does not clearly *rule out* such a possibility.

- Tonal also pointed for support to Figure 1 of the '925 patent. (D.I. 119 at 8-9; Tr. at 153-54)[10]  There, an input device is depicted (at 132) being located on a control panel (130), just underneath what is clearly a digital display (134).  ('925 patent, FIG. 1 & col. 5:42-45)  Tonal suggests that the depicted input device is a physical dial.  (D.I. 119 at 8-9; Tr. at 153-54)  But iFIT disagreed that this is so, (Tr. at 168-69), and the Court sees iFIT's point.  Even assuming that what is depicted at 132 is a dial, because the image is not shown in a three-dimensional perspective, the Court cannot say for sure that this is a picture of a physical dial (as opposed to a digital representation of a dial).  The drawing is just not very clear in this respect.  So again here, when the patents-in-suit are discussing input devices like dials, they do not emphatically wall off the possibility that "a dial" could be a digital representation.[11]

---

[10]     iFIT suggested that information in the '925 patent should be deemed largely or completely irrelevant because "a dial" is not actually claimed in that patent.  (D.I. 119 at 14; Tr. at 168-69)  The Court disagrees that the content of the '925 patent is immaterial to the claim construction process here.  After all, the '925 patent is similar in many ways to the '767 and '214 patents—in that they share the same inventors, recite somewhat similar subject matter and have priority dates only months apart.  (D.I. 119 at 17)  The '925 patent, then, can surely provide at least some insight into what "a dial" is.

[11]     Even were it clear that digital representations of a dial were not described or depicted in any of the patents, that would not necessarily win the day for Tonal.  Courts have held that a term in a patent should not be construed to exclude digital versions of a component— even if the disclosed embodiments only referenced a physical version of that component—so long as the patent did not state that a physical version of the component was essential or important to the claimed invention.  *See MobileMedia Ideas LLC v. HTC Corp.*, CASE NO. 2:10-CV-112-JRG, 2012 WL 12894259, at *20 (E.D. Tex. Dec. 10, 2012); *see also E-Watch Inc. v. Apple, Inc.*, Case No. 2:13-CV-1061-JRG-RSP, 2015 WL 1387947, at *17-19 (E.D. Tex. Mar. 25, 2015) (rejecting the defendant's assertion that the claimed "input key" and "keypad" had to be physical push-buttons as opposed to virtual keys on a display, where "[n]othing in the record suggests that the patentee disclaimed any particular types of 'buttons and/or switches'").

- So if the patents do not clearly state that a dial cannot be digitally represented, what else do we know about whether, in the relevant time period (i.e., 2013), a dial on an exercise machine *could* have been displayed in digital form?  Here, there is no dispute that it could have been.  (D.I. 119 at 15, 17)  iFIT notes, for example, that Peloton had incorporated a large touchscreen on an exercise bike at this time (though that version of the Peloton bike had a manually-controlled physical dial for adjusting resistance).  (*Id.* at 15 (citing D.I. 120 at JA469); *id.* at 17 (citing D.I. 120 at JA524))[12]  Thus, in 2013, digital versions of dials could well have been in use on exercise machines like the one claimed here.[13]  And while Tonal's expert Mr. Voris disagrees that a POSITA in 2013 would have understood a "dial" to include a digital representation, he does not claim that it would have been impossible, or even difficult, to include such a digital representation in an exercise bike at that time.  (D.I. 120 at JA302-03)  Instead, he notes that in the relevant time period, touchscreens were far more expensive to implement on such machines than they are today, and that only a very pricey version of a touch sensor would have allowed a user in 2013 to manipulate a digital "dial" with ease.  (*Id.*)  To the Court, this all indicates that, at the relevant time, it might well have made sense for a patentee to allow its claimed exercise bike to potentially have either physical or digital dials.  Both types of such dials could have been helpful to a user (depending on the cost of the particular product that read on the patents-at-issue).

Again, a patentee is entitled to the full breadth of the claimed invention.  And here, with the relevant patents seeming to allow for "a dial" to be a digital representation of a dial—or, at

---

[12]   We know for sure that by 2022, exercise bikes had digitally-represented features known as a "dial."  That is because in a March 2022 publication, Tonal itself depicted a "weight dial" on its machine as being a digital representation of a dial.  (D.I. 119 at 7; D.I. 120 at JA44-46)  That said, the Court agrees with Tonal, (D.I. 119 at 13), that because this publication came years after the relevant priority date here (in 2013), the Court should not give it weight in the claim construction calculus.

[13]   As iFIT notes, even if touchscreen dials were not feasible in 2013, that too would not necessarily be a barrier to adoption of its proposed construction.  (D.I. 119 at 15 (citing *Innogenetics, N.V. v. Abbott Lab'ys*, 512 F.3d 1363, 1371-72 (Fed. Cir. 2008) ("Our case law allows for after-arising technology to be captured within the literal scope of valid claims that are drafted broadly enough.")))

15

least, not clearly eliminating the possibility—the Court agrees with iFIT:  "a dial" should be construed to mean "a physical or digital representation of a plate or disk that is rotated to select a setting."

## IV.    CONCLUSION

For the foregoing reasons, the Court recommends that the District Court adopt the following constructions:

1.      "electromagnetic unit" means "a unit having at least one electromagnet," and "magnetic mechanism" means "a mechanism having at least one magnetic element."  These terms do not implicate Section 112(f).

2.      "tower" means "an upright structure that helps support various components of the exercise apparatus."

3.      "a dial" means "a physical or digital representation of a plate or disk that is rotated to select a setting."

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court.  *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated March 7, 2022, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated:  April 26, 2023

*Christopher J. Burke*
Christopher J. Burke

UNITED STATES MAGISTRATE JUDGE